## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

==============================
                                        :
**AUCTUS FUND, LLC,**                   :
                                        :
          **Plaintiff,**                :
                                        :
          **v.**                        :          __Civil Action No. 1:19-cv-10641-WGY__
                                        :
**VERUS INTERNATIONAL, INC.**           :
 **f/k/a REALBIZ MEDIA GROUP, INC.,**   :
                                        :
          **Defendant.**                :
                                        :
==============================

### PLAINTIFF AUCTUS FUND, LLC'S
### FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

## I. INTRODUCTION

1.       The Plaintiff, Auctus Fund, LLC, (hereinafter "Auctus" or the "Fund"), respectfully submits its First Amended Complaint and Demand for Jury Trial (hereinafter the "Amended Complaint") against the Defendant, Verus International, Inc. f/k/a RealBiz Media Group, Inc. (hereinafter the "Company" or "VRUS"), in the above-captioned action. The Plaintiff's allegations, as set out herein, are asserted for injunctive and equitable relief, and for its general, compensatory and consequential damages arising from, and resulting from, the Defendant's violations of the following:

> a)       Section 10(b) of the Securities Exchange Act of 1934, *as amended* (hereinafter the "Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5;

> b)       Massachusetts Uniform Securities Act, M.G.L. c.110A, §§ 101, *et seq.*, *as amended* (hereinafter the "Uniform Securities Act");

> c)       breaches of contracts;

1

d)    breaches of implied covenant of good faith and fair dealing;

e)    unjust enrichment;

f)    breaches of fiduciary duty;

g)    fraud and deceit;

h)    negligent misrepresentation; and/or

i)    the Massachusetts Consumer Protection Act, *as amended*, M.G.L. c. 93A, §§ 2 and 11.

2.      The Plaintiff further alleges that, as a result and as caused by the Defendant's securities fraud, breaches, actions, omissions, policies, practices, and/or courses of conduct, Auctus has suffered irreparable harm, requiring injunctive relief and specific performance, harm to its business and reputation in the investment industry, damages from the Defendant's coercion, duress, and unfair and deceptive anti-competitive acts, causing lost revenue, lost profits and prospective business, together with its injuries and damages.

3.      The Plaintiff respectfully requests that its causes of action against the Defendant proceed to a trial by jury, that a judgment be entered on all Counts against the Defendant and that Auctus be awarded its general, compensatory and consequential damages and losses, costs, interest, plus multiple and/or punitive damages, attorneys' fees, and grant, order and enter temporary, preliminary and permanent injunctive and equitable relief, and grant, order and enter declaratory relief, and any such other relief as this Honorable Court deems just and appropriate.

## II. **PARTIES**

4.      The Plaintiff, Auctus Fund, LLC is a limited liability company, duly organized in the State of Delaware, with its principal place of business located at 545 Boylston Street, 2nd Floor, Boston, Massachusetts 02116.

5.      Upon information and belief, the Defendant, Verus International, Inc., f/k/a RealBiz Media Group, Inc., is a corporation, duly organized in the State of Delaware, with a principal place of business located at 9841 Washingtonian Boulevard, Suite 390, Gaithersburg, Maryland 20878.

### III. JURISDICTION AND VENUE

6.      The Plaintiff asserts that this Honorable Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, and under the Securities Act of 1933, *as amended*, 15 U.S.C. §§ 77a, *et seq.* (hereinafter the "Securities Act"), and under the Exchange Act, 15 U.S.C. §§ 78a, *et seq*.

7.      The Plaintiff contends that, pursuant to 28 U.S.C. § 1391(b), venue is proper in the District of Massachusetts in that, pursuant to the Transaction Documents and the Inducement Transaction Documents (as each is defined below), the Plaintiff Auctus and Defendant VRUS agreed that any and all disputes between and/or among them shall be brought, *inter alia*, in the state or federal courts in the Commonwealth of Massachusetts. Additionally, this Court is in such District where the Plaintiff Auctus is headquartered and has its principal place of business and is where the violated conduct described herein is alleged to have occurred.

8.      This Court has personal jurisdiction, generally and specifically, over the Defendant by express terms of the Transaction Documents and the Inducement Transaction Documents, and as arising from its extensive business contacts, generally over time and specifically, in its business dealings with Auctus within the Commonwealth of Massachusetts.

### IV. FACTUAL BACKGROUND

**A.      The Auctus Invests in VRUS and the Transaction Documents**

9.      On or about May 7, 2017, the Company executed, *inter alia*, a certain Securities Purchase Agreement (hereinafter the "First SPA" or the "First Purchase Agreement") and a certain Convertible Promissory Note (hereinafter the "First Convertible Note" or the "First Note" and, with the First Purchase Agreement and certain other documents, collectively hereinafter the "First

Transaction Documents"), thereby entering into a contract with Plaintiff Auctus for its investment in VRUS.  *See* First Purchase Agreement, attached, restated and incorporated by reference herein as **Exhibit A**; First Convertible Note, attached, restated and incorporated by reference herein as **Exhibit B**.

10.     On or about July 26, 2018, the Company executed, *inter alia*, a certain Securities Purchase Agreement (hereinafter the "Second Purchase Agreement," and, with the First Purchase Agreement, collectively hereinafter as the "Purchase Agreements") and a certain Convertible Promissory Note (hereinafter the "Second Convertible Note" or the "Second Note" and, with the First Note, collectively hereinafter as the "Convertible Notes" or the "Notes"; and, with the Second Purchase Agreement and other documents, collectively hereinafter the "Second Transaction Documents"; and, with the First Transaction Documents, collectively hereinafter as the "Transaction Documents"), thereby entering into further contracts with Plaintiff Auctus for its additional investment in VRUS. *See* Second Purchase Agreement, attached, restated and incorporated by reference herein as **Exhibit C**; Second Convertible Note, attached, restated and incorporated by reference herein as **Exhibit D**.

11.     A review of the Plaintiff's Transaction Documents reveals that the Notes have a conversion feature into which entitles the Plaintiff to convert, at amounts and upon timing that Auctus deemed appropriate, the Defendant's debt obligations, in whole or in part, into freely traded shares of VRUS common stock.  Under the terms and conditions of the Transaction Documents, the Plaintiff has, and has had, a contractual right to convert at a price for VRUS common stock, averaged over a series of prior trading days, including and preceding the Conversion Date.

12.     By the Transaction Documents, the Defendant was also required to allocate and reserve shares of its common stock for future conversions by the Plaintiff. The reservation of shares was an independent obligation by the Defendant to the Plaintiff, and was a mechanism by which to

effectuate the share conversion as envisioned by the Notes.

13.     In reliance upon the Transaction Documents, during the relevant time period, the Plaintiff issued Notices of Conversions and converted portions of its investment in the Defendant into shares of freely traded VRUS common stock in the over-the-counter (hereinafter "OTC") securities markets, and, as a VRUS shareholder and at various times, the Plaintiff has held certain equity positions in VRUS shares in the Defendant Company.

14.     Thus, in detrimental reliance upon the information, representations and statements from the Defendant, the Plaintiff invested hundreds of thousands of dollars in the Company, which has, and has had, a fiduciary duty and a duty of the utmost loyalty to the Plaintiff.  Unfortunately, to its detriment, the Plaintiff has learned that the Defendant had misrepresented and deceived the Fund, and omitted material information while having a duty of disclosure, regarding the Company, and perpetrated securities fraud in connection with the offer, purchase and sale of securities, in violation of, *inter alia*, Section 10(b) of the Securities Exchange Act of 1934, *as amended*, and Rule 10b-5, as promulgated thereunder, and the Massachusetts Uniform Securities Act, M.G.L. c. 110A, §§101, *et seq., as amended.*

**B.     Defendant's Misrepresentations and Omissions of Material Facts and Securities Fraud in Connection with Offer, Purchase and Sale of Securities**

15.     The Plaintiff asserts and alleges that the Defendant misrepresented, omitted and failed to provide material facts to Auctus in connection with its investments and in the offer, purchase and sale of securities, and especially with respect to the business, finances, operations and other material matters relating to the Defendant, including but not limited to certain corporate transactions of Defendant VRUS.

16.     As an example of such material misrepresentations, omissions and/or misleading or false information, on or about June 20, 2017, the Defendant published and disseminated certain statements, entitled "*RealBiz Media Group (Verus Foods) Reports Q2 Fiscal 2017 Results,*

*Announces Largest Quarterly Revenue in Company History*," which provided, in pertinent part, as follows:

> "NEW YORK, NY--(Marketwired - Jun 20, 2017) - RealBiz Media Group, Inc. (OTCQB: RBIZ), currently operating as Verus Foods (Verus), today announced its financial results for its second quarter of fiscal 2017, ended April 30, 2017. As previously reported, the company has not yet begun full operations while it completes the resolution of legacy RealBiz issues that have impacted its ability to transition solely into an international foods business."
>
> "Our primary and ongoing frustration involves the legacy RealBiz lawsuits that we inherited, which have prevented us from executing a reverse stock split or closing on financing to begin our rapid growth initiatives. While a trial date (July) and resolution may be just around the corner, we nonetheless were forced to mute our growth this quarter due to these unresolved lawsuits." Said CEO Anshu Bhatnagar.
> "…Our gross margin of 17.7% is consistent with our expectations for this type of business, so we have the ability to become profitable very quickly once we are able to scale our operations to a quarterly run-rate of just a few million dollars in sales. Considering that this quarter was back-end loaded, that is a very achievable near-term goal."

17.     Upon information and belief, the Defendant's statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

18.     Solely as a further example of the material misrepresentations, omissions and/or misleading or false information, of the Defendant, on or about March 22, 2017 and before Auctus' investment, the Defendant published and disseminated certain statements, entitled "*RealBiz Media Group (VERUS Foods) Reports Q1 Fiscal 2017 Results, Commences Shipment on Initial Beef Order,*" which provided in pertinent part as follows: "As previously communicated, this represents the last quarter of the legacy RealBiz real estate operations and does not yet reflect the impact of the transition to Verus Foods…. So the next quarter, Q2 2017, will mark the real beginning of the Company in its new form as Verus Foods…."

19.     The Plaintiff alleges that the statements by the CEO Anshu Bhatnagar were misleading and materially incomplete. Solely as an example of the same, according to VRUS's Form

10-Q, for period ending July 31, 2017, the Defendant had total assets of $993,616.00, while also having total liabilities of $1,904,748.00 demonstrating the precarious nature of the Company's business and/or finances. *See, e.g.,* Verus International, Inc. Form 10-Q for the period ending January 31, 2017, and as Filed March 22, 2017, at p. 3 (emphasis added), attached, restated and incorporated by reference herein as **Exhibit E**; *see also* Verus International, Inc. Form 10-Q for the period ending April 30, 2017, and as Filed June 19, 2017, at p. 4 (emphasis added), attached, restated and incorporated by reference herein as **Exhibit F.**

20.     As a further example of such material misrepresentations, omissions and misleading information, on or about July 26, 2017, the Defendant published "*RealBiz Media Group Provides Business Update Announces New Operating Units and Product Category,*" which provided, in pertinent part, as follows:

> "As previously communicated, July was an important month on the calendar due to the expected trial date for the legacy lawsuit involving Monaker Group and the company. Unfortunately, this date was pushed back to March 2018 by the court, due to a scheduling conflict. Although management cannot predict the outcome of current negotiations, the company is in very active discussions with the main parties involved, all of whom hold significant positions in RBIZ and are also adversely affected by further delays."

> "Luckily, we can still grow the company while we wait for this date or some other resolution," explained Anshu Bhatnagar, CEO of Verus Foods, "but I think all parties understand that to handicap our growth is not logical and explains the mindset that led to the failure of the prior RealBiz business. To put this in perspective, we have given guidance that Verus can generate more revenue every five days than RealBiz did in its best full year. No reasonable shareholder would stand in the way of that kind of growth. We are doing everything in our power to end this unreasonable delay and hope to announce alternative solutions in coming weeks."

> "From an operational standpoint, the company continues to position itself for future expansion, with the following activities completed since the last communication with shareholders:

> - Formed United Arab Emirates subsidiary -- Verus Foods MENA Ltd.
> - Formed Singapore-based subsidiary -- Verus Foods Sg Pte. Ltd
> - Signed new banking relationship with Standard Chartered Bank in Singapore to facilitate trade transactions for shipments - will reduce collection cycle significantly.

- Set an August start date for Vietnam beef shipments, at an initial $2.5 million/month rate
- CFO search complete, offer in place with lead candidate (pending acceptance)
- Signed agreement with Aznar, an international supplier of 100% natural pomegranate juice under the Grante Band for the retail sector.
- Began interviewing additional candidates to expand the company's Board of Directors"

"This new relationship with Standard Chartered Bank is very important because it will allow us to finance some of our shipments into clients, enabling us to generate some modest growth despite the persistent handicap to financing from the legacy RBIZ lawsuits," explained CEO Bhatnagar. "Also of great significance, the Grante pomegranate juice agreement marks our initial move into the retail space, an area where that first SKU is often the hardest. We believe that this relationship will open the door to sourcing other favorable high-margin products for the important retail segment."

"Verus Foods has completed the organizational measures necessary to meet its initial growth projections, with only the timing of milestones to be determined by the status of the legacy lawsuits. Investors should expect more frequent news flow in the near future as the company completes additional actions to expand its infrastructure and sales."

21.     Upon information and belief, the Defendant's statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. While misleading investors to indicate that VRUS was in a position to grow significantly, the Company's Form 10-Q for period ending July 31st, 2017, demonstrated total assets of $993,616.00 with total liabilities of $1,904,748.00. Shareholder equity continued to materially decline, despite VRUS's CEO making bold and misleading statements such as "Verus can generate more revenue every five days than RealBiz did in its best full year." *See* Verus International, Inc. Form 10-Q for the period ending July 31, 2017, and as Filed September 19, 2017, at p. 4 (emphasis added), attached, restated and incorporated by reference herein as **Exhibit G**.

22.     As a further example of such material misrepresentations, omissions and misleading information, on or about August 25, 2017, the Defendant published "*RealBiz Media Group/Verus Foods Prepays Promissory Note*," which provided, in pertinent part as follows:

"NEW YORK, NY--(Marketwired - Aug 25, 2017) - Verus Foods (the "Company"), currently trading as RealBiz Media Group, Inc. (OTCQB: RBIZ), would like to inform investors that it has prepaid the Convertible Promissory Note entered into with PowerUp Lending Group, Ltd. ("PowerUp") and dated February 21, 2017. Pursuant to the Note, the final date for prepayment was Monday, August 28, 2017."

"By prepaying, RealBiz will prevent the conversion of the note millions shares of free-trading stock."

"This action is consistent with the Company's intention to replace all of its early, less favorable debt with new sources of funds that will have superior terms and conditions. Furthermore, this prepayment follows the Company's stated goal to minimize sources of dilution during the important early stages of its growth cycle."

"All of our early funding choices were out of necessity, due to the unexpected delay in our reverse split caused by the ongoing legacy lawsuit," explained Anshu Bhatnagar, CEO of Verus Foods. "We are working diligently to sign new sources of funds that better reflect our future potential. Our goal is to layer on our funding in a stair-step manner that helps us continue to grow, so that each successive funding will be better than the last. The capital markets reward scale and size, so this prepayment is the first step in our strategy to properly capitalize our growth in a way that best serves our shareholders."

23.    Upon information and belief, the Defendant's statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. For example and upon information and belief, the Defendant had not articulated a strategy of retiring older debt by prepayments, and had omitted the alleged details relating to "new sources of funds" with "superior terms and conditions." The Defendant had failed to articulate omitted material information to the Plaintiff, inter alia, on the parameters for dilutions, use of reverse stock splits, proper capitalization, and misleading asserted that "each successive funding will be better than the last."

24.    As a further example of material misrepresentations, omissions and misleading information, on or about September 21, 2017, the Defendant published "*RealBiz Media Group (Verus Foods) Reports Q3 Fiscal 2017 Results, Provides Operational Update on Planned Spin-off of Real Estate Division*," which provided, in pertinent part, as follows:

NEW YORK, NY--(Marketwired - Sep 21, 2017) - RealBiz Media Group, Inc. (OTCQB: RBIZ) currently operating as Verus Foods (Verus), is pleased to announce financial results for its third quarter of fiscal 2017, ended July 31, 2017. As previously reported, the company has not yet begun full operations while it completes the resolution of legacy RealBiz issues that have impacted its ability to transition solely into an international foods business.

"We spent most of Q3 setting up infrastructure and logistics in Dubai, India, Vietnam and Singapore," said Anshu Bhatnagar, CEO of RealBiz/Verus. "The legacy RealBiz lawsuit has been a source of ongoing frustration, so I am happy to report some progress in splitting our two divisions into separate companies. Our revenue ramp was delayed again by this legacy issue, but Verus is now operationally-prepared to begin its sales growth -- with an independent board, a highly experienced CFO, and new divisions in Dubai and Singapore."

In terms of the Verus business, the company is pleased to provide the following highlights for the quarter:

- Q3 2017 revenue totaled $1.15 million, a 409% increase over Q2 2016, representing the largest sales quarter in company history
- Verus posted a small net loss of $170,934 in Q2 2017, largely due to infrastructure expansion to support future sales growth
- With the addition of the Vietnam buffalo order, the company now has signed annual contracts totaling $103 million
- In Q3 2017, the company completed the formation of United Arab Emirates and Singapore Divisions, and signed a formal banking relationship with Standard Chartered Bank to facilitate new opportunities in Asia

Post quarter-end, the company would also like to provide additional corporate developments:

- The company hired industry veteran Piyush Munot as Group CFO of its Middle East, Africa and Asian operations. Mr. Munot has a distinguished career at KMPG, PWC, and was recently Group Finance Controller at a Division of Al Dahra Holding, the leading food and agriculture dedicated sovereign wealth fund in Abu Dhabi, UAE. Mr. Munot received his MBA from Indian Institute of Management, Ahmedabad, India (one of the top 10 business schools in the world) and is a US Certified Public Accountant.
- A court ruling on August 30, 2017 in Montgomery County Circuit Court placed control of the legacy Monaker Group litigation with the Real Estate Division, thereby enabling the real estate and food units to split into separate companies.
- Under the terms of this ruling, RealBiz will now be able to finally spin-off the legacy RealBiz business, with the Real Estate Division renamed "NestBuilder" and operating as a distinct public company under the direction of Alex Aliksanyan; and the Verus Foods Division operating as

a separate public company under the direction of CEO Anshu Bhatnagar. Shareholders of record at the time of the spin-off will own shares in both companies.

"Our ultimate goal is to separate Verus Foods from these legacy disputes, so we are pleased to finally see some progress in that regard," explained Anshu Bhatnagar, CEO of Verus Foods. "We still have some details to iron out, so we cannot yet provide a schedule on the spin-off. However, this ruling will enable us to separate as soon as possible into an independent food business that gives shareholders the fresh start that we have been hoping for since the beginning of this year. "

25.     Upon information and belief, the Defendant's statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. Despite multiple assurances that VRUS was in a position to growth significantly in a short period of time, the Defendant was forced to acknowledge that growth was continued to be delayed. Over a period of months, VRUS continued to emphasize that the "next quarter" would be better while substantially falling short of its representations. As a further example of the misleading statements is illustrated by the Company's Form 10-Q for the period ending July 31, 2017. VRUS should have been experiencing significant growth and profitability rates, especially after receiving $352,000.00 in Notes from various investors, including Auctus, throughout Q3 of 2017. *See* Form 10-Q for the period ending July 31, 2017 (**Exhibit G**), at p. 12.

26.     As a further example of material misrepresentations, omissions and misleading information, on or about October 30, 2017, the Defendant published "*RealBiz Media Group (Verus Foods) Announces Plans for Spin-off of Real Estate Division*," which provided, in pertinent part, as follows:

"GAITHERSBURG, MD--(Marketwired - Oct 30, 2017) - RealBiz Media Group, Inc. (OTCQB: RBIZ) ("RealBiz" or the "Company") which currently operates two business segments -- an international food subsidiary ("Verus Foods") that sells products to customers worldwide and a real estate digital media and technology company -- is pleased to announce the execution of a definitive agreement to spin-off the real estate segment into a separate public company named NestBuilder.com Corp. ("NestBuilder"). Stockholders of record at the time of the spin-off will receive an equivalent stock position in the newly formed digital real estate company. The

consummation of the spin-off will be subject to the declaration of effectiveness by the Securities and Exchange Commission ("SEC") of a NestBuilder Form 10 registration statement to be filed with the SEC within 60 days of the date of the Spin-off agreement.

Under terms of the Spin-off agreement, all liabilities incurred by RealBiz prior to January 2, 2017 will be assumed by NestBuilder, leaving Verus Foods in an excellent position to pursue its expansion plans in its global food business. As previously communicated, Mr. Alex Aliksanyan has exclusive control and direction of the legacy Monaker lawsuits in his capacity as CEO of NestBuilder. In addition, NestBuilder has agreed to indemnify, defend and hold harmless RealBiz from and against all damages, costs and expenses arising out of or resulting from the Monaker lawsuits. Per the agreement, the net operating loss of the Company will remain with RealBiz.

In conjunction with these changes, Mr. Alex Aliksanyan and Mr. Tom Grbelja will leave the employ of RealBiz to become the CEO and CFO, respectively, of NestBuilder. Concurrent with these actions, RealBiz will change its name to Verus Foods and also apply for a new stock trading symbol. The Company will apply for these changes as soon as possible and will update shareholders as execution dates become available."

"It is wonderful that all RealBiz shareholders will benefit from our actions today," explained NestBuilder CEO Alex Aliksanyan. "A 'two-for-one' stock is a tremendous bonus. Our new product at NestBuilder, which we have been diligently working on for years, is now completed. We have been waiting for the spin-off before launching, so needless to say, we are very excited."

"At Verus Foods, we are very happy to finally be able to move ahead as a separate entity, with our own identity and name," said Verus Foods CEO Anshu Bhatnagar. "This is more than just a symbolic move, because we expect this separation to enable us to complete some of the unfinished steps that have delayed our growth. As an operational update, we also expect to leverage our expertise in the international food distribution sector by entering the retail arena in the near future via manufacturing acquisitions. So, some very big things are coming at Verus Foods and we have a long list of potential business opportunities that we are eager to explore."

The company's goal is to apply immediately for all regulatory approvals necessary to complete the spin-off, name change and other related corporate actions."

27.   Upon information and belief, the Defendant's statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. The Defendant's claim that the "all Realbiz shareholders will benefit from … [the Company's actions" was bogus as the Plaintiff did not receive such illusory benefits.  Furthermore, the Defendant's representations that "'two-for-one' stock [was] a tremendous bonus" was similarly

false and misleading. As the Transaction Documents were clear as to the nature of transactions which were appropriate and permissible, and the Defendant materially mislead the Plaintiff regarding the "spin-off transaction" and its intentions to comply with its contractual obligations.

28.    Further, the Defendant omitted material information, with a duty to disclose the same to the Plaintiff, and was materially misleading as to the financial and operational impact of such "spin-off" transaction. For example, the Company's Form 10-K provided that the auditors believed that "there … [was] a substantial doubt about … [the Company's] ability to continue as a going concern," which is, and was, materially different from the false and misleading assertions of the Defendant. *See* Verus International, Inc. Form 10-K for the period ending October 31, 2017, and as Filed March 26, 2018, at p. 5 (emphasis added), attached, restated and incorporated by reference herein as **Exhibit H**.

29.    As a further example of material misrepresentations, omissions and false information provided to the Plaintiff, on or about December 13, 2017, the Defendant published "*RealBiz Media Group (Verus Foods) Announces Corporate Update*," which provided, in pertinent part as follows:

> NEW YORK, NY , Dec. 13, 2017 (GLOBE NEWSWIRE) -- RealBiz Media Group, Inc. (OTCQB: RBIZ) currently operating as Verus Foods ("Verus" or the "Company") is providing the following interim update in advance of its fiscal year-end report.
>
> Effective December 15, 2017, Mark Lindsey resigned as Chief Financial Officer ("CFO") of the Company. Mr. Lindsey's resignation was not the result from any disagreement with the Company, any matter related to the Company's operations, policies or practices, the Company's management or the Board. As a result, the Company has named industry veteran Piyush Munot as interim CFO. Mr. Munot, who is a U.S.-accredited CPA, has an extensive background uniquely suited to building Verus's international business. As a former KMPG professional and senior auditor, he was involved in a full range of financial activities with companies throughout the Gulf Cooperation Council ("GCC") countries. Most recently, he served as a Group Controller at Al Dahra Holding, a major food and agricultural firm in the region."
>
> "I recommended to Anshu that he should establish a stronger presence in Dubai where financial controls are most critical at this stage in the company's business cycle," explained Mr. Lindsey. "I helped hire Piyush and have suggested that the Company use an interim CFO based in the region until growth necessitates a full-time CFO in

Maryland. It is unfortunate that continued delays have prevented the Company from growing at a pace that would warrant my ability to stay, but I believe this new, more cost-effective structure will be better suited for Verus at this early stage. The Company should be in very capable hands with Piyush onboard."

"…Furthermore, the Company is unhappy to report additional interference from former CEO Alex Aliksanyan, who has filed a motion for contempt based upon appointment of directors Michael O'Gorman, Thomas Butler Fore, and Lalit Lal on August 10, 2017. In his filing, Mr. Aliksanyan is seeking a court order that would remove the directors based upon his interpretation of prior agreements. The reasons behind this action to remove the independent board are unrelated to any current operations at Verus. Mr. Aliksanyan stated, through counsel, that he does not want future board actions to interfere with the spin off. The Company will update shareholders as information becomes available."

30.     Upon information and belief, the Defendant's statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. Upon information end belief, the Company was misleading regarding the circumstances on the departure of its Chief Financial Officer and its statements claiming that the "resignation was not the result from any disagreement with the Company, any matter related to the Company's operations, policies or practices, the Company's management or the Board." Furthermore, the repeated glowing statements by the Defendant regarding its financial prospects are contradicted by the reported finances and operations, and the turnover of senior executives. For example, the inability to retain the services of an experienced CFO does not support the claim that VRUS was on the brink of "great growth."

31.     Similarly, as a further example of the materially misleading and such omissions, according to the Company's Form 10-Q for period ending January 31, 2018, the Defendant had total assets of $190,398.00 and total liabilities of $807,400.00 at that time. Even though VRUS had significant funds from third-parties, such as Auctus, shareholder equity continued to decline. Accordingly, the Plaintiff asserts that the Defendant's statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

32.     As a further example of material misrepresentations, omissions and misleading information, on or about January 4, 2018, the Defendant published "*Realbiz Media Group Announces Goal to Retire Convertible Debt in 2018*," which provided, in pertinent part, as follows:

> Gaithersburg, MD, Jan. 04, 2018 (GLOBE NEWSWIRE) -- RealBiz Media Group, Inc. (OTCQB: RBIZ), currently operating as Verus Foods (the "Company"), announced today that based on pending sources of new funding, the Company does not intend to allow any of the previously contracted notes to convert into shares. The most recent transaction in this process involved the retirement of a note from PowerUp Lending Group totaling $57,592 on December 29, 2017. The pace of retirement of the existing convertible debt will depend upon receipt of various forms of financing currently under negotiation, so the timeline on reducing and eliminating this debt is not yet finalized. But, based on recent events, Verus has set a goal to eliminate this debt during 2018.

> As part of that plan, Verus expects to receive new funding from former RealBiz Chairman Don Monaco as soon as the shares from the Monaker Group/RealBiz settlement are issued. Investors should be aware that this funding from Mr. Monaco was negotiated separately by Verus Foods and was not part of the Monaker Group/RealBiz settlement, but is dependent upon fulfillment of that settlement prior to receipt of funds. Details of the Monaco funding will be released after receipt, but can be considered more favorable than existing debt.

> "While we are in discussions with multiple sources of working capital, the funding from Don is essential to move forward, because it can be used to prevent near-term conversions and fund some shipment growth before it is fully deployed to retire debt," commented Verus CEO Anshu Bhatnagar. "Preventing shareholder dilution is important, but so is revenue growth, which can lead to more favorable and traditional forms of working capital. Our goal in 2018 is to replace all of our current debt with new and better forms of capital, so this gives us the ability to start that process in a meaningful way.  Our capital program will involve a stair-step approach as we avoid dilution by pushing out existing debt conversion dates, while gradually eliminating less favorable forms of debt."

33.     Upon information and belief, the Defendant's statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. Furthermore, upon information and belief, the Defendant engaged in a strategy intended to deny the Plaintiff its agreed-upon contractual rights, and avoid its duties and obligations under the Transaction Documents.

34.    As a further example of material misrepresentations, omissions and misleading information, on or about January 31, 2018, the Defendant published "RealBiz Media Group Announces Receipt of Funds and Return of Common Shares," which provided, in pertinent part as follows:

> Gaithersburg, MD, Jan. 31, 2018 (GLOBE NEWSWIRE) -- RealBiz Media Group, Inc. (OTCQB: RBIZ), currently operating as Verus Foods (the "Company"), is pleased to announce that Verus has received an unrestricted one-year promissory note in the sum of $530,000 from Monaker Board Member Don Monaco. This note greatly enhances the Company's financial position and will be used for corporate purposes, both to create growth and to retire debt. The use of these funds will depend upon working capital discussions currently ongoing with other entities.
>
> In addition, the Company is reporting the return of a portion of the shares issued in conjunction with the recent Monaker settlement. Following that agreement in December 2017, Verus CEO Anshu Bhatnagar requested indemnification on behalf of RBIZ shareholders in the form of 50% of the 8,326,630 RBIZ shares awarded to NestBuilder by Monaker.  In conjunction with today's announcement, NestBuilder has agreed with that request and has returned 4,163,315 shares of common stock to RealBiz.
>
> These actions signify a final resolution and end to all existing litigation, share disputes, and other disagreements between Monaker Group, NestBuilder, RealBiz and related parties. As a reminder, current RealBiz shareholders of common stock will receive an equivalent number of shares in NestBuilder following the upcoming spin-off, which is in final review with the SEC.
>
> "This marks a major milestone in becoming a fully-independent company as Verus Foods," commented Verus CEO Anshu Bhatnagar. "We have operated under the cloud and expense of the RBIZ legacy lawsuits during our entire time as a public food company, so to have those layers of litigation finally end goes beyond a sense of relief. Coupled with this influx of funding, we now have the chance to manage both our growth and debt on our own terms. The events of the last year were not something we expected at our starting point in January of 2017, and we have some remaining challenges to overcome, but our vision to create a global food business remains the same."
>
> With all litigation and share-count issues now settled, the remaining scheduled corporate actions include a spin-off timetable (dependent on the SEC), followed by a name and symbol change.

35.    Upon information and belief, the Defendant's statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same

16

to the Plaintiff. Solely as an example, the Defendant's assertions that it "would use the funds to retire debts" is misleading and incomplete. Moreover, the Plaintiff asserts that VRUS was misleading in its claims that the Company would "manage both our growth and debt on our own terms."

36.     As represented in Verus' 10-K for period ending October 31, 2018, VRUS's liabilities totaled $2,960,336.00, with assets totaling $1,402,107.00. Not only did VRUS fail to retire its debt in 2018, it increased its total liabilities from 2017, which totaled $2,262,109.00 *See* Verus International, Inc. Form 10-K for the year ending October 31, 2018, and as Filed March 19, 2019, at p. F-2 (emphasis added), attached, restated and incorporated by reference herein as **Exhibit I**. Furthermore, as described below, the Defendant breached its Inducement Agreement with the Plaintiff and failed to honor a variety of terms and conditions to deliver shares in NestBuilder following the spin-off transaction.

37.     As a further example of material misrepresentations, omissions and false information provided to the Plaintiff, on or about April 23, 2018, the Defendant published "*RealBiz Media Group/Verus Foods Provides Corporate Update, Announces SEC Approval for Spin-Off of Real Estate Division*," which provided, in pertinent part as follows:

> GAITHERSBURG, MD, April 23, 2018 (GLOBE NEWSWIRE) -- RealBiz Media Group, Inc. (OTCQB: RBIZ), currently operating as Verus Foods (the "Company"), is providing this corporate update in order to give more current information to investors following the filing of the Company's 10-K for fiscal 2017 (year ended October 31st, 2017). The Company is happy to report that the SEC has approved the spin-off of the NestBuilder Real Estate Division and set a record date of April 25, 2018 and a distribution date of May 18, 2018. Current RealBiz (RBIZ) shareholders will receive one (1) share of NestBuilder common stock for each three hundred (300) shares of RealBiz.
>
> Commenting on our 10-K filing for the recently completed fiscal year, to call 2017 a "difficult" year would be an understatement, as the Company spent nearly its entire first 12 months in operation under the cloud of lawsuits connected to the former RealBiz business. However, even under this unexpected environment, the Verus Foods Division was able to make significant headway in positioning itself for the future. Some highlights from 2017 include:

- Establishing a regional headquarters in Dubai along with enough cold-storage and other infrastructure to support significant growth in the region
- The creation of a Singapore-based Division to address opportunities in the Asian markets
- The signing of a major branded product category, via the Disney-branded juice deal in the UAE and Oman
- Resolution of the legacy RealBiz lawsuits
- Expanding operations to cover the four key sales categories in our business -- wholesale, van, retail and HORECA (hotel, restaurant, & cafeteria)

For investors, May of 2018 should be considered the symbolic restart for Verus in conjunction with the expected spin-off, which will be followed closely by a name (and symbol change) from RealBiz Media Group to Verus Foods.

Thus far in 2018, the following highlights are worth noting:

- Our cost structure improved, due to shifting part of our financial structure to our Dubai entity
- The Company continues to receive interest from additional suppliers and brands that have a desire to begin shipping into Middle Eastern and North African markets
- Verus Foods enters 2018 with an achievable backlog of $109M, without counting additional traction from existing customers

In response to questions from shareholders, the Company can confirm that it is in late-stage discussions with multiple new, traditional financing sources, though the outcome of those talks is not yet certain. The current backlog cannot be fulfilled until financing improves, so all backlog figures should be considered achievable goals, but not projections of revenue under the Company's current capital structure. Verus intends to provide specific forward-looking revenue projections when it finalizes some form of working capital funding.

"We set a goal at the beginning of 2017 to create an infrastructure capable of supporting a large-scale food business in the Gulf Cooperation Council (GCC) countries and surrounding regions during our first year in business," explained Verus CEO Anshu Bhatnagar. "Despite being saddled with costly RealBiz-related legacy litigation that blocked our ability to attain funding, we still managed to build that infrastructure at minimal cost. Our goal was to end 2017 with operations covering the four key sales categories in our business -- wholesale, van, retail and HORECA (hotel, restaurant, & cafeteria) – and we achieved that goal. Given the challenges, our financial performance showed none of this organizational progress, but investors should understand that our company is built and ready to support significant and rapid growth once we have the right capital in place. In that regard, funding is obviously our number one priority and our daily focus."

In addition to traditional forms of third-party working capital financing, the Company is also discussing letter of credit (LOC) financing with certain key suppliers. Updates on topics such as share count, debt, and other corporate metrics will coincide with the upcoming Fiscal 2018 Q1 report.

38.    Upon information and belief, the Defendant's statements were incomplete,

misleading, and/or misrepresentative or omitted material information with a duty to disclose the same

to the Plaintiff. The Defendant stated that "to call 2017 a 'difficult' year would be an understatement,

as the Company spent nearly its entire first 12 months in operation under the cloud of lawsuits

connected to the former RealBiz business." Upon information and belief, the Defendant failed to

disclose and omitted material information to the Plaintiff regarding the "cloud of lawsuits" which

made 2017 a "difficult" year. As a further example, the Company's assurances of a glowing future

were misleading in that operations and finances were significantly at various to those reported to the

regulatory authorities.

39.     For example, the Company's Form 10-K, for year ending October 31, 2018, indicates

that VRUS was still operating at a loss, with a cumulative loss of $2,751,368. The Plaintiff contends

that the reference to a "$109M backlog" was materially misleading and omitted information that the

Company had a duty to disclose to Auctus. *See* Form 10-K for the year ending October 31, 2018

(**Exhibit I**), at p. F-3.

40.     As an example of the material misrepresentations, omissions and false information

provided to the Plaintiff, on or about May 11, 2018, the Defendant published and disseminated

certain statements, entitled "RealBiz Medial Group/Versus Foods Announces Creation of New

Middle East Division", which provided, in pertinent part, as follows:

> GAITHERSBURG, MD, May 11, 2018 (GLOBE NEWSWIRE) --RealBiz Media Group,
> Inc. (OTCQB: RBIZ), currently operating as Verus Foods (the "Company"), is providing this
> corporate update in order to communicate operational improvements in the Dubai-based
> operations and to answer selected shareholder questions concerning the recently filed 10-Q
> for Q1/2018…
>
> In terms of the recently filed 10-Q for Q1/2018, the company would like to remind investors
> that the quarter reflects the interim period prior to funding and during the resolution of the
> legacy lawsuit. Clearly, this was a period of high legal expenses and distractions from
> operating the business and is not reflective of future trends. In answer to investor questions
> concerning Q1/2018, the following comments are applicable:
>
>   • Margins will fluctuate until the Company establishes larger monthly shipments,
>     but break-even can be achieved in the $5.0-$6.0 million annual sales range.

- The Company is in ongoing due diligence to establish viable sources of working capital
- The Company is now current in terms of its financial filings.

'We are very excited to begin the expansion of our own brands into our target markets,' explained Verus CEO Anshu Bhatnagar. 'That process requires a very specialized skill set, involving multi-lingual packaging and country-specific requirements. For example, all packaging must include both English and Arabic. Being able to move these essential tasks in-house will enable us to build awareness at a lower cost. This also puts us on track for deeper penetration into retail channels, which carry higher margins and a greater variety of product categories. As this subsidiary begins to gain traction, our goal is to add an additional 22 sales people during 2018 to service the UAE more fully. Our improved financial status is finally enabling us to implement the steps necessary for growth, so we look forward to communicating the results of these initiatives in future updates.'"

41.    Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. According to the Form 10-K as of the period ending October 31, 2018, the Defendant had four full-time employees and five part-time employees. On or about July 26, 2018, the Plaintiff invested an additional $137,250.00 in VRUS, in anticipation of the significant growth as frequently claims by the Company. *See* **Exhibit 1 Note 2**, as attached, restated and incorporated by reference herein.  However, VRUS did not hire the 22 sales people during 2018 as they represented in their press release.  *See* Form 10-K for the year ending October 31, 2018 (**Exhibit I**), at p. 4.

42.    In or about the summer of 2018, upon information and belief, the Defendant engaged in a transaction by which the distribution of the Company's real estate division was spun-off into a separate corporation, Nestbuilder.com Corporation (hereinafter "Nestbuilder").  Nestbuilder.com Corp. is, and was, a corporation, duly organized under the laws of the State of Nevada.

43.    In a certain Form 10-Q, as filed with the U.S. Securities and Exchange Commission (hereinafter the "SEC" or the "Commission"), the Defendant described the spin-off transaction as follows:

"We entered into a Contribution and Spin-off Agreement with NestBuilder.com Corp. ('NestBuilder') on October 27, 2017, as amended on January 28, 2018, whereby,

> effective as of August 1, 2018, we spun off our real estate division into NestBuilder. *All of our stockholders as of July 2, 2018, the record date, which held their shares as of July 20, 2018, the ex-dividend date, received one share of NestBuilder common stock for each 900 shares of our Company owned.* As a result of the spin-off of the real estate segment, all related assets and liabilities are disclosed net as current assets and current liabilities within the consolidated balance sheets, and all related income and expenses are disclosed net as income (loss) from discontinued operations within the consolidated statements of operations and comprehensive income (loss).

*See* Verus International, Inc. Form 10-Q for the quarter ending January 31, 2019, and as Filed March 25, 2019 , at p. 10 (emphasis added), attached, restated and incorporated by reference herein as **Exhibit J**; s*ee also* Certain Pages of OTCMarkets.com, dated August 16, 2018, and referencing the Company's Press Release, "*RealBiz Media Group Corporate Update: Announces Completion of Spin-Off and New Contract Covering Multiple Products*," dated August 16, 2018, attached, restated and incorporated by reference herein as **Exhibit K**.

44.     In its press release, entitled "*RealBiz Media Group Corporate Update: Announces Completion of Spin-Off and New Contract Covering Multiple Products*," dated August 16, 2018, the Company stated, in pertinent part, as follows:

> "Gaithersburg, MD, Aug. 16, 2018 (GLOBE NEWSWIRE) -- RealBiz Media Group, Inc. (OTCPink: RBIZ) (the 'Company') is pleased to announce that as of August 10, 2018, the distribution of the NestBuilder real estate division was successfully completed.  This marks the starting point for Verus Foods as an independent company with a singular focus on the food industry.  Most importantly, the Company will now be able to pursue a variety of business opportunities that had been placed on hold under the prior structure.
>
> * * * *
>
>  'Now that we are fully independent, we finally have the freedom to create our own identity and become more active in pursuing growth opportunities,' explained Verus CEO Anshu Bhatnagar. 'This contract represents new business (not in our current backlog) and is just the start of the kind of recurring orders that are available to us with the right financing. In this case, we can rely on the LC to minimize our need for funds, while still generating significant revenue.'
>
> * * * *
>
> In terms of corporate matters, the completion of the NestBuilder distribution will now enable Verus to file for a name and symbol change, which is expected as early as next

week. Due to the significant number of strategic initiatives in various stages of development, the Company has also elected to discuss topics such as capital structure, additional financing, and potential new business lines in follow-on updates.

'I just completed a very productive international business trip where I met with suppliers, customers and potential partners,' said CEO Bhatnagar. 'Due to the significant number of strategic initiatives currently in process, we have decided to schedule a more detailed update after the outcomes of these discussions have been determined. We are currently in near-term negotiations involving new contracts, sources of financing and, for the first time, merger and acquisition opportunities – each of which could have a material effect on our capital structure and the strategic direction of our business. We expect to have clarity on some of these initiatives in the next several weeks.'

45.     The spin-off transaction of Nestbuilder by the Defendant was a material event which impacted the finances, operations and prospects of the Defendant, and materially affected the terms and conditions of the Transaction Documents between the Parties.

46.     As a further example of the material misrepresentations, omissions and misleading information provided to the Plaintiff, on or about September 24, 2018, the Defendant published and disseminated certain statements, entitled "*RealBiz Media Group/Versus Foods Reports Q3 Fiscal 2018 Results*", which provided, in pertinent part, as follows:

GAITHERSBURG, MD, Sept. 24, 2018 (GLOBE NEWSWIRE) -- via NEWMEDIAWIRE - RealBiz Media Group, Inc. (OTC: RBIZ), currently operating as Verus Foods (the "Company"), today announced the financial results for its third quarter of fiscal 2018, ended July 31, 2018. In conjunction with these results, the Company is also providing a corporate update.

In terms of Q3/2018, management is noting the following items of importance: …

On a forward basis, the Company would like to provide the following update:

- The Company is completing the logistical arrangements of its new multi-product order, which will involve as many as a dozen products sourced from six or more countries. This new mixed-product order is expected to ship at a rate of approximately $1.0 million per month when it commences in the next several weeks.
- Verus is currently in discussion with the remaining convertible note holders concerning the potential payoff of the notes.

- As part of a proposed recapitalization, the Company is in active discussions with a syndicate of investors who have expressed an interest in replacing the existing debt structure along with funding a portion of current backlog.
- Verus can confirm that it is in very late stage discussions with two M&A candidates, one that would represent a line extension into existing markets; and a second that would create significant vertical integration opportunities and new facilities on two continents.

"We are attempting to forge a path that minimizes dilution, but maximizes growth," said Verus CEO, Anshu Bhatnagar. "We have the funding right now through our trade financing to achieve annual revenue of close to $20M if everything falls into place, but clearly that is just a small measure of what we can do with more capital to deploy. While our newest contract has flexible financing and can expand to meet our customer's needs, our legacy contracts are performing at a maintenance level pending different forms of additional financing. So, our focus is on strategies that will unlock these sources of revenue as quickly as possible."

47.    Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. For example, according to the Defendant's Form 10-K for the period ending October 31, 2018, net convertible notes payable totaled $1,497,126.00, and the Plaintiff asserts that it was misleading with material omissions for the Defendant to contend that it was in the process of paying off convertible notes. *See* Form 10-K for the year ending October 31, 2018 (**Exhibit I**), at p. F-2.

48.    Over a period of months, the Plaintiff and the Defendant negotiated as to the dispute, which had arisen between them relating to the Auctus investment in the Company.

49.    On or about February 8, 2019, the Company fraudulently induced the Plaintiff to execute a series of contracts in order to resolve their dispute, including but not limited to an Inducement Agreement, a Release, and a Payoff Agreement. *See* Inducement Agreement between Auctus Fund, LLC and Verus International, Inc., dated February 8, 2019, attached, restated and incorporated by reference herein as **Exhibit L**; Release between Auctus Fund, LLC and Verus International, Inc., dated February 8, 2019, attached, restated and incorporated by reference herein as **Exhibit M**; Payoff Agreement, between Auctus Fund, LLC and Verus International, Inc., dated

February 8, 2019, attached, restated and incorporated by reference herein as **Exhibit N**, and, with the Inducement Agreement and the Release, collectively hereinafter the "Inducement Transaction Documents").

50.     Under the Inducement Agreement, the Defendant agreed to pay Auctus $200,000.00 in cash, and "facilitate the delivery of a minimum of 90,000 free trading shares of the common stock of Nestbuilder.com Corp., … on or before February 8, 2019," and "facilitate the delivery of such number of additional free trading shares of common stock of Nestbuilder such that the Shares together with the additional shares shall equal, in the aggregate, 201,153 shares on or a minimum of 90,000 free trading shares of the common stock of Nestbuilder.com Corp., …" on or before March 8, 2019. Inducement Agreement (**Exhibit L**), ¶¶ 3 & 4 at p.1.

51.     Moreover, the Inducement Agreement, in a provision entitled "*Nestbuilder Shares*," provided, in pertinent part, as follows:

> "**Nestbuilder Shares**. In order to induce the Lender to enter into the Release and this Agreement, the *Company hereby agrees to facilitate the delivery of the Additional Shares on or prior to March 8, 2019* (the "**Delivery Date**"). The Delivery Date shall be extended to March 22, 2019 if the Company is unable to facilitate the delivery of the Additional Shares by March 8, 2019 solely as a result of a delay in processing of the transfer of the Additional Shares to the Lender by Nestbuilder's transfer agent (so long as the Company has (i) provided all documentation required by Nestbuilder's transfer agent, stock powers, and transfer instructions to Nestbuilder's transfer agent by March 8, 2019 for the transfer of the Additional Shares, and (ii) paid any applicable purchase price to the transferor(s) of the Additional Shares by March 8, 2019)…."

*Id*. (**Exhibit L**), § 2, at p.1 (emphasis added).

52.     Section 3 of the Inducement Agreement, in a provision entitled "*Default,*" provided, in pertinent part, as follows:

> "**Default**. In the event that the Company is unable to facilitate the delivery of the Additional Shares by the Delivery Date (the "**Default**"), *the Company shall pay the Lender $10,000 dollars on the first date of the Default and on each monthly anniversary of such Default if the Default shall not have been cured by such date (pro-rated for periods less than thirty (30) days) until the Default is cured*. For the avoidance of doubt, any payments by the Company to the Lender pursuant to this Section 3 of this Agreement *shall not in any way reduce or limit Auctus' rights or*

> *claims against the Company with respect to the Preserved Claims* (as defined in the Release)."

*Id*. (**Exhibit L**), § 3, at p.1 (emphasis added).

53.     Furthermore, the Plaintiff asserts that the Defendant fraudulently induced the Plaintiff to enter into the Inducement Agreement in order to deceive Auctus into providing a release, while never intending to provide the required considerations or honoring the terms and conditions. For example, Section 4 of the Release, in a provision entitled "*Preserved Claims,*" provided, in pertinent part, as follows:

> "Preserved Claims. For the avoidance of doubt, and notwithstanding anything to the contrary in this Release, the Releasor shall retain all of the Releasor's rights with respect to all federal, state, local, foreign and any other jurisdiction's statutory or common law claims (including claims for contribution and indemnification), causes of action, complaints, actions, suits, defenses, debts, sums of money, accounts, covenants, damages, orders, judgments and demands of any nature whatsoever, in law or equity, known or unknown, of any kind, including, but not limited to, claims or other legal forms of action, that the Releasor ever had, now has, may have, may claim to have, or may hereafter have or claim to have, against the Company and its affiliates, agents, employees, officers, directors, managers, shareholders, stockholders, stakeholders, owners, predecessors, successors, assigns, subrogees, insurers, trustees, trusts, administrators, fiduciaries and representatives, if any, but solely those arising from or related to the Releasor's rights under Section 1.6 of the Notes with respect to shares of common stock of Nestbuilder.com Corp., a Nevada corporation ('Nestbuilder'), in connection with the Company's spin off of Nestbuilder (the 'Preserved Claims')."

Release (**Exhibit M**), § 4, at p.3.

54.     In its press release, entitled "*Verus International Announces $1.45 Million Financing and Retirement of Notes*," dated February 12, 2019, the Company stated, in pertinent part, as follows:

> "Gaithersburg, MD, Feb. 11, 2019 (GLOBE NEWSWIRE) -- via NEWMEDIAWIRE -- Verus International, Inc. ('Verus' or the 'Company') is pleased to announce that it has received $1.45 million in funding, as detailed in a Form 8-K filed today. The notes were placed with two separate institutional-quality shareholders; individuals who had already invested in Verus through prior purchases. Importantly, this funding places the stock in the hands of friendly equity-oriented investors who expressed a desire to increase their stake in the Company.
>
> Concurrent with this funding, *Verus is pleased to announce that it has retired all of the variable rate convertible notes* ("toxic notes") held by four separate creditors.

This action is particularly important because it will *enable Verus to remove a sizeable reserve from its balance sheet and avoid paying millions of dollars in penalties and other charges*. As part of this multi-party agreement, the Company's other key note-holder, Donald Monaco, has agreed to extend his $530,000 note for an additional nine months, with no significant change in terms. These actions are now completed and signed off by all parties, giving the Company full releases from all prior note holder provisions.

'This marks the culmination of nearly two years of effort to put behind the legacy of RBIZ-related issues. *These negotiations were difficult and long, with as many as 15 parties involved in the process. But the end result was well worth the effort, because we negotiated terms that avoided any default interest or fees, were at a substantial discount to the standard premium, and ended the threat of significant dilution from our existing note holders,*' explained Verus CEO Anshu Bhatnagar. 'Our goal was to create a structure that minimized dilution, but left us with a good foundation to finally begin our growth stage. We know both investors well and they represent a new stage in our goal to move toward institutional-quality funding sources that carry better terms and involve long-term oriented partners.'

* * * *

'The impact of this funding cannot be understated,' said Bhatnagar. 'We needed to clean up these existing notes before we could commence our other growth initiatives. With the delinquent debt now erased, we can finally move ahead with a master plan that has been waiting for a green light for many months. Our goal is to uplist to a major exchange in 2019 and to grow our business both organically and through mergers and acquisitions. This financing marks the initial step in that process.'

*See* Certain Pages of OTCMarkets.com, dated April 4, 2019, and referencing the Company's Press Release, "*Verus International Announces $1.45 Million Financing and Retirement of Notes*," dated February 12, 2019, attached, restated and incorporated by reference herein as **Exhibit O**.

55.     On or about February 8, 2019, the Defendant fraudulently induced the Plaintiff to execute the Inducement Agreement, the Release and the Payoff Agreement, while never intending to honor or perform its obligations pursuant to the same.

56.     On or about February 8, 2019, Defendant VRUS breached the Inducement Agreement and has refused and has failed to cause the delivery of a minimum of 90,000 free trading shares of the common stock of Nestbuilder.com Corp.

57. On or about March 8, 2019, the Defendant further breached the Inducement Agreement and has refused and has failed to cause the delivery of the Additional Shares which shall equal, in the aggregate, 201,153 free trading shares of the common stock of Nestbuilder.com Corp.

58. As of March 8, 2019, the Defendant has caused an Event of Default and has breached Section 3 of the Inducement Agreement, in that the Defendant has refused and has failed to pay Auctus $10,000.00 on or before March 8, 2019, and is liable for an additional penalty of $10,000.00 to the Plaintiff on each and every monthly anniversary thereafter as to such continuing Default.

59. In detrimental reliance on the fraudulent conduct of VRUS and its obligations under the Inducement Agreement and the delivery of Nestbuilder Shares, the Plaintiff caused a short position to occur and, in the absence of the delivery of such Shares and Additional Shares, has significant financial risk and irreparable harm arising from a prospective price increase due to obligation to cover such Shares and Additional Shares with its broker-dealer.

60. Defendant VRUS has committed fraud and has made material misrepresentations and omitted material information while having a duty to disclose the same to the Plaintiff, prior to and in connection with the offer, purchase and sale of securities with Auctus, and in connection with the Inducement Transaction Documents and in connection with the Transaction Documents by which the Plaintiff invested hundreds of thousands of dollars in the Company.

61. As a direct and proximate cause of the violations of the federal and state securities laws of the Defendant, Plaintiff Auctus has suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendant.

C. **Defendant's Events of Default and Breaches of the SPAs and Notes**

62. Based upon the fraud and deceit and securities fraud by the Defendant the Plaintiff contends that it has a bona fide basis to prosecute claims on the Transaction Documents, and that

the fraudulent release was void, whether *ab initio* or otherwise, and/or voidable.

63.     Thus, the Plaintiff asserts that the Company incurred and/or caused several Events of Default, as set forth in Article III, entitled "*Events of Default,*" of the Notes. These Events of Default included, *inter alia*, breaches of following provisions of the Transaction Documents: a) Sections 1.3 (Authorized Shares); b) Sections 1.4(g) (Sub-penny conversion price); c) Section 1.4(h) (Failure to Deliver Common Stock prior to Delivery date); d) Section 2.8 (Non-circumvention; e) Section 3.1 (Failure to pay principal or interest); f) Section 3.2 (Failure to Honor Conversion); g) Section 3.4 (Breach of Agreements and covenants – Sections 2.8 of the Note (Non-circumvention) and 1.3 (Authorized Shares)); h) Section 3.5 (Breach of Representations and Warranties -Section 3(g) (SEC Documents; Financial Statements)) of that certain Securities Purchase Agreements (the "SPAs") by and between RBIZ and AFL dated May 17, 2017 and July 26, 2018; i) Section 3.10 (Failure to Comply with the Exchange Act); and  j) Section 4.14 (Failure to notify of Future Financing).

64.     As set forth herein, it is undisputed that the Company incurred and/or caused several Events of Default, as set forth in Article III, entitled "*Events of Default,*" of the Notes. In addition, pursuant to Section 3.1, an Event of Default shall have occurred by the failure of the Company to pay the principal or interest when due on the Notes, whether at maturity, upon acceleration, or otherwise. *See* Notes (**Exhibit B**) and (**Exhibit D**), § 3.1. These Events of Default, together with others, have occurred and continue to occur to the date of this filing.

65.     Upon the occurrence of an Event of Default under Section 3.1 of the Notes, the entire principal and accrued interest shall be due and owing hereunder. Furthermore, an Event of Default pursuant to Section 3 of such Notes, the Company is required to pay, and shall pay, the Fund the "Default Sum" (as defined therein), due under the Note as multiplied by One Hundred - Fifty and 00/100 (150.00%) percent. Thus, as of September 18, 2019, the Company owes the Fund, under the

SPAs and the Notes, the Default Sum totaling Seven Hundred – Fifty-One Thousand –Two Hundred – Six and 77/100 (**$751,206.77**) Dollars (U.S.). *See* **Exhibit 1 Note 1 and Note 2**, as attached, restated and incorporated by reference herein. Until paid, the Default Sum shall continue to accrue the default interest rate of Twenty-four and 00/100 (24.00%) percent per year, provided by the Notes.

66.     In sum, the Defendant has committed securities fraud, unfair and deceptive trade practices, and has perpetrated a fraud and deceit upon the Plaintiff, which suffered as a consequence. Throughout, the Defendant has been unjustly enriched and converted the Plaintiff's assets, causing it to suffer further damages and injuries. As a result of the fraudulent scheme, actions, concealment, and omissions of the Defendant, the Plaintiff lost substantial monies and lost opportunity in such assets.

## V. <u>VIOLATIONS OF LAW</u>

## <u>COUNT I - VIOLATIONS OF FEDERAL SECURITIES LAWS</u>

67.     The Plaintiff reasserts Paragraphs 1 through 66 of the Amended Complaint, together with **Exhibits**, and restates and incorporates them herein by reference.

68.     The Defendant violated the Securities Act, 15 U.S.C §77a, *et seq.,* in addition to Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, in that, as described herein, and in connection with the purchase, offer and sale of securities, they knowingly, recklessly and intentionally:

a)      employed manipulative and deceptive devices and contrivances;

b)      employed devices, schemes and artifices to defraud;

c)      made untrue statements of material fact and omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and

d)      engaged in acts, practices and a course of business which operated as a fraud or deceit upon the Plaintiff.

69.      As a direct and proximate cause of the violations of the federal securities laws by the Defendant, Plaintiff Auctus has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendant.

## COUNT II - VIOLATIONS OF MASSACHUSETTS STATE SECURITIES LAWS

70.      The Plaintiff reasserts Paragraphs 1 through 69 of the Amended Complaint, together with **Exhibits**, and restates and incorporates them herein by reference.

71.      The Defendant violated the Massachusetts Uniform Securities Act, Massachusetts General Laws Chapter 110A, §§ 101, *et seq.*, *as amended*, in that, as described herein, it offered and sold securities by means of untrue statements of material fact.

72.      The Defendant recklessly and intentionally misrepresented material information and omitted disclosure of material information to the Plaintiff in connection with the offer, purchase and sale of securities in the Commonwealth of Massachusetts.

73.      As a direct and proximate cause of the violations of the Massachusetts state securities laws by the Defendant, Plaintiff Auctus has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendant.

## COUNT III – BREACHES OF CONTRACT

74.      The Plaintiff reasserts Paragraphs 1 through 73 of the Amended Complaint, together with **Exhibits**, and restates and incorporates them herein by reference.

75.     Pursuant to the Security Purchase Agreements and the Convertible Notes, the Fund invested in the Company and sought to become a shareholder, in good faith, to join the Company in the accomplishment of its business goals and in accordance with the standards of the business and the securities industry.

76.     By its spin-off of Nestbuilder.com Corp., the Plaintiff contends that the Defendant caused Events of Default and breached the contract with the Plaintiff under the Transaction Documents, by its conduct and as described herein.

77.     Pursuant to the Inducement Transaction Documents, the Plaintiff entered into a contract with the Defendant to resolve the outstanding dispute arising from the Events of Default arising from the spin-off of Nestbuilder.com Corp. by the Defendant, as described herein.

78.     The Fund alleges that the Company is liable for a breach of contract and for a breach of an implied covenant of good faith and fair dealing. A breach of contract is failure without excuse to perform a duty which is due under the contract. Additionally, the interpretation of a contract is a question of law, not fact. If the wording is not ambiguous, then the contract must be enforced according to its plain terms.

79.     The Plaintiff performed its obligations under the Transaction Documents and under the Inducement Transaction Documents, and in good faith.

80.     The Defendant, by its conduct described herein, violated the Transaction Documents and the Inducement Transaction Documents, breaching its contracts with the Plaintiff.

81.     As a direct and proximate cause of the Defendant's breaches of its contracts, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

## COUNT IV – BREACHES OF IMPLIED
## COVENANT OF GOOD FAITH-FAIR DEALING

82.     The Plaintiff reasserts Paragraphs 1 through 81 of the Amended Complaint, together with **Exhibits**, and restates and incorporates them herein by reference.

83.     It is well established in that every contract carries an implied covenant of good faith and fair dealing whereby the parties treat each other fairly and act in good faith and no party to the contract shall take any action to harm another party's rights under the contract. The duty imposed by this "implied covenant of good faith and fair dealing" pertains to bad faith in the performance of a contract, not just in its execution or negotiation. Implicit in every contract is the requirement on faithfulness to an agreed upon common purpose and consistency with the justified expectations of the other party.

84.     A breach of contract is the failure to perform for which legal excuse is lacking. As a matter of law, a contract existed, which the Company breached and failed to comply with the covenant of good faith and fair dealing. The law is clear - the Fund had binding contracts and the Company has no legal basis, as a matter of law, to avoid its obligations under the Transaction Documents and under the Inducement Transaction Documents, including but not limited to damages which arose, and which might arise, as a result from the breach of such Transaction Documents and Inducement Transaction Documents.

85.     The Defendant had a duty of good faith and fair dealing in its dealings with the Plaintiff and pursuant to the promises, contracts, and statements made to the Plaintiff to induce it to enter into the contracts and provide assets to the Defendant in exchange for its promise to honor its obligation under the same.

86.     Under the covenant, the Defendant was obligated to a good faith performance of its obligations under the Transaction Documents and the Inducement Transaction Documents with Auctus, and to be faithful and consistent to the justified expectations of the Plaintiff.

87.     As described above, the Defendant breached the implied covenant of good faith and fair dealing with the Plaintiff.

88.     As a direct and proximate cause of the Defendant's breaches of the implied covenant of good faith and fair dealing, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

## COUNT V – UNJUST ENRICHMENT

89.     The Plaintiff reasserts Paragraphs 1 through 88 of the Amended Complaint, together with the **Exhibits**, and restates and incorporates them herein by reference.

90.     The Defendant illegally received assets and benefits from the Plaintiff, as arising from its false and fraudulent statements and misrepresentations, and without providing equivalent value therefor.

91.     The Defendant's actions, courses of conduct, and omissions were wantonly, intentionally, and maliciously conducted against the Plaintiff, to its detriment.

92.     The Defendant has been unjustly enriched by its actions, as described herein.

93.     As a direct and proximate cause of the Defendant's unjust enrichment, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

## COUNT VI – BREACH OF FIDUCIARY DUTY

94.     The Plaintiff reasserts Paragraphs 1 through 93 of the Amended Complaint, together with the **Exhibits**, and restates and incorporates them herein by reference.

95.     A fiduciary relationship existed between the Plaintiff and the Defendant, requiring it to act with a duty of the utmost loyalty and trust on behalf of the Plaintiff.  As a fiduciary, the Defendant was required to maintain and protect the welfare of the Plaintiff.

96.     By engaging in the conduct described herein, the Defendant breached its fiduciary duties to the Plaintiff.

97.     As a direct and proximate cause of the Defendant's breach of fiduciary duty, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

## COUNT VII – FRAUD AND DECEIT

98.     The Plaintiff reasserts Paragraphs 1 through 97 of the Amended Complaint, together with the **Exhibits**, and restates and incorporates them herein by reference.

99.     The actions of the Defendant described herein constitute fraud and deceit, including but not limited to the following:

  a)     the Defendant made false representations of material facts, and/or omitted material facts with a duty of disclosure, knowing or having reason to know of their falsity;

  b)     the Defendant made said misrepresentations and omissions for the purpose of inducing reliance from the Plaintiff; and

  c)     the Plaintiff did rely upon said misrepresentations and omissions, to its detriment.

100.    As a direct and proximate cause of the Defendant's fraud and deceit, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages,

including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

## COUNT VIII - NEGLIGENT MISREPRESENTATION

101.    The Plaintiff reasserts Paragraphs 1 through 100 of the Amended Complaint, together with **Exhibits**, and restates and incorporates them herein by reference.

102.    The conduct of the Defendant as described herein constitutes negligent misrepresentation because the Defendant negligently provided the Plaintiff with erroneous and misleading information, and negligently omitted material information with a duty to disclose, to the Plaintiff's detriment.

103.    As a direct and proximate cause of the Defendant's negligent misrepresentations, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

## COUNT IX - VIOLATIONS OF MASSACHUSETTS
## CONSUMER PROTECTION ACT / M.G.L. C. 93A, §§ 2 & 11

104.    The Plaintiff reasserts Paragraphs 1 through 103 of the Amended Complaint, together with the **Exhibits**, and restates and incorporates them herein by reference.

105.    At all relevant times herein, the Defendant conducted a trade or business, as defined by the Massachusetts Consumer Protection Act, M.G.L. c. 93A, within the Commonwealth of Massachusetts.

106.    The conduct of the Defendant as described herein, constitutes unfair and deceptive trade practices, and unfair competition, under Sections 2 and 11 of the Consumer Protection Act, including but not limited to claims that the Defendant:

a)   executed the Transaction Documents and the Inducement Transaction Documents with full knowledge and understanding of the Defendant's obligations to the Plaintiff;

b)   fraudulently induced the Plaintiff to invest in the Company and thereby breached its promises to the Plaintiff;

c)   fraudulently concealed from the Plaintiff the full and complete financial and operational details and prospects of the Company in inducing the Plaintiff to make its investment in the Company;

d)   fraudulently induced the Plaintiff to enter into the Inducement Transaction Documents, while never intending to honor the same;

e)   has fraudulently exposed the Plaintiff to virtually unlimited financial risk as may arise from a prospective transaction to cover the Nestbuilder Shares and Additional Shares, and from a potential appreciation in the price of shares of Nestbuilder upon the declaration of the registration of Nestbuilder as being Effective by SEC, thereby causing the Shares and Additional Shares of Nestbuilder to be freely tradeable in the public OTC markets;

f)   knowingly and intentionally concealed these activities from the Plaintiff, to its detriment; and/or

g)   violated the requirements, terms and conditions of existing statutes, rules and regulations meant for the protection of the public's health, safety or welfare.

107.   As a direct and proximate cause of the Defendant's violations of the Massachusetts Consumer Protection Act, M.G.L. c. 93A, Sections 2 and 11, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

36

## VI. <u>REQUESTS FOR RELIEF</u>

WHEREFORE, the Plaintiff, Auctus Fund, LLC, respectfully request that this Honorable Court grant it the following relief:

A)      Order, grant and enter temporary, preliminary and permanent injunctive and equitable relief, and specific performance, and finding that the Plaintiff has suffered irreparable harm, has a likelihood of success on the merits, that the balance of hardships favors the Plaintiff and that it is in the public interest to grant such temporary, preliminary and permanent injunctive and equitable relief, and specific performance for the benefit of the Plaintiff, as set forth herein;

B)      Determine that the Defendant is liable for all damages, losses, and costs, as alleged herein;

C)      Determine and award the Plaintiff, Auctus Fund, LLC, the actual losses sustained by it as a result of the violations of law by the Defendant, as set forth herein;

D)      Render a judgment and decision on behalf of the Plaintiff, Auctus Fund, LLC, on all Counts of the Amended Complaint, and issue findings of fact and rulings of law, as necessary and appropriate, that the Defendant is liable, in all respects;

E)      Order, decide, adjudge, and determine that the liability of the Defendant,  is for all losses, injuries, and damages, special, consequential, general, punitive, and/or otherwise, and for all interest and costs, as alleged herein;

F)      Award the Plaintiff, Auctus Fund, LLC, its costs, including, but not limited to, filing fees, costs, expenses and interest, for being required to prosecute this action;

G)      Award the Plaintiff, Auctus Fund, LLC, its actual attorneys' fees, for being required to prosecute this action;

H)      Award the Plaintiff, Auctus Fund, LLC, multiple, double, treble, and/or punitive damages in an amount to be determined;

I)      Enter judgment on behalf of the Plaintiff, Auctus Fund, LLC, on the Amended Complaint;

J)      Order declaratory relief, as appropriate and as this Honorable Court deems necessary; and/or

K)      Any additional relief, which this Honorable Court deems just and proper.


**THE PLAINTIFF, AUCTUS FUND, LLC,**
**<u>DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE</u>**


Respectfully Submitted,
PLAINTIFF, Auctus Fund LLC,

By its Attorneys,


<u>   /s/  *Philip M. Giordano*   </u>
Philip M. Giordano, Esq. (BBO No. 193530)
Sophia E. Kyziridis, Esq. (BBO No. 703590)
Giordano & Company, P.C.
REED & GIORDANO, P.A.
47 Winter Street, Suite 800
Boston, Massachusetts 02108-4774
Telephone: (617) 723-7755
Facsimile: (617) 723-7756
Email: pgiordano@reedgiordano.com
Email: skyziridis@reedgiordano.com

Dated: September 30, 2019

## **CERTIFICATE OF SERVICE**

I, Philip M. Giordano, do hereby certify that on the 30th day of September, 2019, I caused to be served a true and correct copy of Plaintiff Auctus Fund, LLC's First Amended Complaint and Demand for Jury Trial, as filed by and through the District Court's electronic filing/ECF system and that such true copy is available for downloading and viewing by all counsel of record, and emailed a true copy to counsel for record.


Dated: September 30, 2019                    */s/ Philip M. Giordano*
                                              Philip M. Giordano